## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### NO: 7:11-CV-00241-FL

| | | |
|---|---|---|
| KAMAL G. ABULSAAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| RELIABLE AND LOYAL MANAGEMENT | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Kamal G. Abulsaad brings this action for monetary relief under the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. §§ 621 to 634 ("ADEA") and under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Compl., DE-1. Before the Court is a motion for summary judgment filed by Plaintiff's former employer, Defendant Reliable and Loyal Management Services, INC ("RLM"). Def.'s Mot. Summ. J., DE-32. Plaintiff has responded to the motion (DE-36), Defendant has replied (DE-38), and the matter is now ripe for adjudication. The motion was referred to the undersigned April 30, 2013, for submission of a memorandum and recommendation. For the reasons stated herein, the undersigned recommends that Defendant's motion for summary judgment be granted.

### I.      BACKGROUND

The evidence before the Court tends to show the following: On November 3, 2008, Dr. Kamal Abulsaad, Plaintiff, was hired as a full-time clinical psychologist by Defendant, a government contractor placement company, until he was terminated on May 5, 2010. Dep. Kamal Abulsaad, 103:9-19, DE-32-1; Letter, May 5, 2010, Ex. 20, DE-32-7, 13. Abulsaad was

born in Cairo, Egypt, and was 70 years old at the time RLM hired him. Dep. K. Abulsaad 12:21-23, 59:23-25. RLM assigned Abulsaad as a civilian contract employee to serve as a clinical psychologist with the United States Air Force at Seymour Johnson Air Force Base ("SJAFB") in North Carolina where he worked in the mental health clinic providing treatment and diagnostic services to members of the military. Id. at 66:14-22, 67:6-12. Major Mark Mullen, the overall commander of the mental health clinic, was Abulsaad's direct supervisor throughout the duration of his employment at SJAFB. Id. at 69:2-10.

Abulsaad made several complaints regarding his interactions with his supervisor throughout his employment at SJAFB to the military chain of command. His first complaint was a verbal complaint in February of 2009 to the Deputy Hospital Commander, Lieutenant Colonel Wishstilschin, regarding Mullen's behavior towards him. Id. at 123:6-17, 125:4-19; Email, Dec. 28, 2009, Ex. 5, DE-32-6, 18. Abulsaad complained of an interaction where Mullen commented that he had a "serious concern" with respect to Abulsaad's "fitness" for the position in which he was hired, after two of the clinic's technicians complained of being fearful of Abulsaad. Dep. K. Abulsaad 125:4-19. In the same instance, Mullen further addressed an unrelated complaint from a patient about Abulsaad. Id. Abulsaad characterized Mullen as rude and further described Mullen as saying, he had watched Abulsaad closely, and although he would give Abulsaad the benefit of the doubt, he intended to document his observations in the future. Id.

Abulsaad next complained to Wishstilschin about Mullen on December 28, 2009, this time by email, where he described four separate incidents of perceived harassment and also revisited the verbal complaint mentioned above. Email, Dec. 28, 2009, Ex. 5, DE-32-6, 18. Abulsaad stated the first incident occurred on February 11, 2009 when he emailed his vacation leave plans to Staff Sergeant Ognibene, who he mistakenly thought had replaced the previous

administrative chief in the clinic. Id. at 20. Staff Sergeant Glorioso informed Abulsaad that she was in charge and that vacation issues should be addressed to her, not Ognibene. Id. On February 20, 2009, Mullen informed Abulsaad that Glorioso had complained to him about Abulsaad's email to Ognibene. Id. Abulsaad explained to Mullen why he had sent the information to Ognibene, but according to Abulsaad, Mullen continued "repeating his statements and questions for over half an hour" and told Abulsaad he was "defensive and passive aggressive". Id.

The email described a second incident on March 19, 2009, where Ognibene asked Abulsaad to sign an order to clear a patient. Id. at 19-20. Abulsaad stated he wanted to consult with Dr. Sperry prior to clearing the patient, but Ognibene informed Abulsaad that Sperry would be out until later in the afternoon. Id. Abulsaad stated that he asked Ognibene if it was okay to wait until Sperry had returned before patient in question was cleared, and Ognibene agreed. Id. Later that day, Mullen came to Abulsaad's office with an investigator, requesting clearance for the patient he had planned to discuss with Sperry. Id. Abulsaad, the investigator, and Mullen all discussed the patient, at which point Mullen cleared the patient, and the investigator left. Id. Next, Mullen asserted that Abulsaad was aware the investigator was waiting in the waiting room for some time because Ognibene had informed Abulsaad of this fact. Id. Abulsaad denied knowing the investigator was waiting, and further denied that Ognibene had in fact made him aware. Id. Mullen then asked Abulsaad if he "had a hearing problem" and Abulsaad admitted he had some hearing loss, and that he occasionally wore a hearing aide. Id. Abulsaad later confronted Ognibene who stated that "he did not wish to dispute" the matter with him. Id. Two days later, Mullen informed Abulsaad that he was concerned about the "paramount damage" Abulsaad had caused in his relationship with Ognibene. Id.

Abulsaad described a third incident that occurred on December 23, 2009 when Mullen loudly stated in the clinic hallway, "Doc I need to talk to you about your tardiness." Id. at 18-19. Abulsaad admitted that he was tardy that day, but felt it inappropriate to be addressed in the manner it was. Dep. K. Abulsaad 133: 3-4. Abulsaad asked Mullen if he could make up the time, but stated that he was denied this request based on the fact that he had more than one instance of tardiness and was further informed that he would not be paid for the missed time. Email, Dec. 28, 2009, Ex. 5, DE-32-6, 18, 18-19. During this same interaction, Mullen also told Abulsaad that he received a complaint from an examinee who was upset about the way her appointment was handled on December 3, 2009. Id. The patient was upset with Abulsaad for attempting to force her to return on a later date to continue her evaluation instead of completing it in a single visit. Dep. K. Abulsaad, 113:14-24. Prior to the patient leaving the clinic, Captain Amy James, Chief of Mental Health, intervened and asked Abulsaad to finish the evaluation that same day and further requested that all future examinees be processed in the same day as well. Id. at 155: 17-20, 117:19-25, 188, 1-3. Abulsaad complied with James' request but felt the situation was handled in an "ass backwards" or "disjointed" way. Id. at 121:6-16. Despite the fact that the patient was on limited travel orders to come to the hospital, Abulsaad stated he usually scheduled an intake interview, and then scheduled computer administered tests for a later date. Id. After the tests, Abulsaad would review the results and then generate inquiries based on the test results and on any other historical information for a final clinical interview with the examinee. Id. Abulsaad further stated that he was briefly trained by Dr. Sperry and Dr. Morrison on how to schedule patients and had not received any complaints about his evaluation process prior to the December 3, 2009 complaint. Id.

In a meeting between the two on December 23, 2009 Abulsaad provided Mullen with a copy of the email correspondences he exchanged with James following the incident where he agreed to complete all future examinations in one day. Email, Dec. 28, 2009, Ex. 5, DE-32-6, 18, 18-19. Abulsaad also stated that throughout the meeting Mullen appeared to be "presenting anger" towards him. Id.

Abulsaad described a fourth incident occurring later on December 23, 2009, where Mullen counseled him for rescheduling a patient's appointment, characterizing it as a failure to provide adequate patient care. Id. Abulsaad stated he attempted to defend his actions and explained to Mullen that the patient had a habit of coming to the clinic to "hang around" and "avoid work", but that Mullen just repeated himself louder and appeared irritated him. Id.; Dep. K. Abulsaad 134:17-19. Abulsaad further stated that Mullen was unyielding in his position regardless of his attempts to clarify or explain his view of the situation. Email, Dec. 28, 2009, Ex. 5, DE-32-6, 18, 19.

In summary, Abulsaad's December 28, 2009 complaint email to Wishstilschin characterized Mullen's actions as demeaning, harassing, and as employing unacceptable means for correction. Email, Dec. 28, 2009, Ex. 5, DE-32-6.

In December 2009 and again in January 2010, Abulsaad's clinical documentation was reviewed as part of the peer review process by James, where it was found deficient. Dep. K. Abulsaad, 79:4-7, 16-25, 80:1-3; Email, Jan. 20, 2010, Ex. 7, DE-32-6, 23. For instance, homicidal and suicidal ideation were mandatory characterizations for each patient and James felt Abulsaad's clinical forms lacked adequate documentation for his patient's homicide and suicidal ideation. Id. at 78:21-25, 79: 4-17. According to Abulsaad, James (Chief of Mental Health) required specific wording to document homicidal and suicidal ideation, but he asserted there was

"no book that will tell you [']do not use these words, use those words[']"; therefore, he felt the discrepancies were merely a difference in professional opinion. Id. at 79:19-25, 80:1-3.

Abulsaad emailed Lieutenant Colonel Poindexter, the Chief of Staff at the SJAFB hospital, on January 20, 2010, regarding his concern over the peer reviews conducted by James, and the following day, Poindexter responded. Email, Jan. 21, 2010, Ex. 7, DE-32-6, 23. Abulsaad described that on January 7, 2010, Mullen discussed the peer reviews and directed Abulsaad to meet with James in order to review them. Id. Abulsaad complied, and arranged to meet with James the following morning. Id.

Abulsaad recounted that prior to the meeting with James; Mullen came to his office and instructed him to take the documentation training with her seriously. Id. Further, Abulsaad said that Mullen referenced a recent negative trend in his notes, but when Abulsaad asked if the negative trend was associated with a specific date or event, Mullen stated he did not know the exact point in time because he "was not watching that closely." Id. Mullen further explained that some of Abulsaad's notes had "jumped" at him in the last couple weeks." Id. When Abulsaad asked if the "jumping" happened around Christmastime, Mullen said, "you know doc[,] I am not an idiot[.] I am busy enough with my job, don't worry about my job" and left his office. Dep. K. Abulsaad 141:7-9.

During the 10-15 minute peer review meeting, Abulsaad and James reviewed five of his records. Email, Jan. 21. 2010, Ex. 7, DE-32-6, 23. James identified all of the inadequate or incorrect sections in his records and emailed Abulsaad the corrected documents the following day. Id. at 23-24. Abulsaad stated that he disagreed with James premises and conclusions, but listened to her and did not question her corrections because he believed the peer review process was not "objective, fair, [or] free from outside influence or agenda items." Id. Abulsaad further

noted that he had only been given three of James' records to review, while James had been given many of his to review. Id. at 24. Abulsaad's email to Poindexter suggested further inconsistencies with respect to other patient files without providing specific details and also referred to his December 28, 2009 complaint to Wishstilschin, but according to Abulsaad, Poindexter took no investigative action. Dep. K. Abulsaad, 158:10-17; Email, Jan. 20, 2010, Ex. 7, DE-32-6, 23.

James identified additional issues with Abulsaad's clinical documentation on January 25, 2010, and returned ten cases and two peer preview sheets to him. Dep. K. Abulsaad, 159:4-15; Email, Jan. 25, 2010, Ex. 8, DE-32-6, 26, 26-27. Abulsaad sent a second email to Poindexter on January 25, 2010, where he complained that James' reviews were "replete with errors" and listed the errors in his email. Id.

Abulsaad emailed Poindexter a third time on January 29, 2010, regarding another issue concerning his clinical documentation. Email, Jan. 29, 2010, Ex. 9, DE-32-6, 28. Here, Abulsaad complained that James faulted his lack of detail regarding his logic over why he ruled out certain diagnoses and in how he determined the diagnosis listed on the document. Id. at 28-29. Further, Abulsaad disagreed with James that his documentation was deficient because it lacked notations addressing the plan for future therapy sessions, as well as the treatment intervention plans for Abulsaad's patients. Id.; Dep. K. Abulsaad, 161 - 164.

Poindexter emailed Abulsaad on February 1, 2010, and informed him that he had directed Dr. Morrison to review Abulsaad's clinical documentation in order to gain a different perspective from another party. Email, Feb. 1, 2010, Ex. 10, DE-32-6, 30. Morrison reviewed several of Abulsaad's notes and also concluded that Abulsaad's risk assessment documentation was inconsistent with Air Force expectations, and recommended further discussion to ensure

7

uniformity.  Dep. K. Abulsaad, 168:1-17; Email, Feb. 1, 2010, Ex. 10, DE-32-6, 30.  Morrison further offered a technique she utilized in her own documentation to make it easier to copy patient information into the clinical documentation program, but Abulsaad said it was just a basic word processing practice and felt no need to inquire further about it.  Dep. K. Abulsaad, 169:15-25, 170:1-5.  Abulsaad later stated that when he asked Morrison of any additional concerns she had about his documentation, she stated she had none.  Id. at 169:11-14.  Thus, Abulsaad reasoned it was "not necessary" to specifically question Morrison about her characterization to Poindexter that his documentation was inconsistent with their expectations.  Id. at 170:11-21.

The Air Force first complained to Defendant (RLM) about Abulsaad in a letter dated February 3, 2010, written by Clarinda Smith, the Air Force contracting officer for the RLM contract.  Letter, Feb. 3, 2010, Ex. 11, DE-32-6, 31.  The letter of concern listed two separate complaints regarding Abulsaad's inadequate clinical documentation and unacceptable behavior which occurred on January 8, 2010, and January 25, 2010.  Id.  The complaint further characterized Abulsaad's "attitude and challenging behavior" as unacceptable, and was concerned because he continued to "show an inability to improve" his documentation style after efforts were made to correct him.  Id.

On February 9, 2010, RLM's Vice President, Barry Hill, replied to the Air Force and stated RLM contacted Abulsaad in order to discuss the issues raised in the February 3, 2010, letter of concern.  Letter, Feb. 9, 2010, Ex. 12, DE-32-6, 32.  Hill noted that Abulsaad had previously filed formal complaints against Mullen and James (the emails to Wishstilschin and Poindexter), and Hill further expressed some concern that while Abulsaad had not changed his documentation style since his arrival in November 2008, he was just now receiving complaints about it.  Id.  Hill further acknowledged that Abulsaad understood the importance of standardized

8

documentation and that a verbal reprimand was issued to him "with the understanding that immediate improvements must be made or further disciplinary actions will be taken." Id.

Smith wrote RLM a second letter of concern regarding Abulsaad on March 23, 2010. Letter, Mar. 23, 2010, Ex. 14, DE-32-7, 5. The letter expressed the Air Force's concern that Abulsaad's performance was not improving after three months of effort where "our military psychologist … spent 25 hours reviewing and documenting problems and appropriate means to correct the problems" with Abulsaad. Id.

Vanessa Garcia, a contract manager for RLM, responded to the Air Force's second letter of concern on April 2, 2010. Letter, Apr. 2, 2010, Ex. 15, DE-32-7, 6. Garcia stated RLM contacted Abulsaad about the second letter of concern and that Abulsaad explained he had since met with the Chief of Staff (Poindexter) "approximately one month ago to discuss and go over exactly what needs to be documented and in which manner to document it." Id. Garcia also stated that Abulsaad assured RLM that he understood the Air Force's documenting requirements and was meeting those requirements for the past month. Id. Garcia then asked for confirmation from the Air Force that her information was correct.

On April 15, 2010, Smith wrote a third complaint to RLM about Abulsaad's deficient medical documentation. Letter, Apr. 15, 2010, Ex. 16, DE-32-7, 7. Smith addressed Garcia's assertion that Abulsaad was now in compliance with documentation standards by stating that just one week following Abulsaad's meeting with the Chief of Staff, a new review of Abulsaad's medical documentation discovered the following deficiencies:

- unclear/inconsistent documentation of suicide/homicide ideation
- no assessment of homicidal ideation
- not providing adequate information in the note to support diagnosis
- not having a treatment plan in records by the patient's 4th visit
- not documenting treatment provided

9

Id. Smith's letter also detailed an incident in which Abulsaad refused to do a safety determination on a patient, and ultimately characterized the issues regarding Abulsaad as "major findings for unacceptable performance." Id. at 8. Smith's letter emphasized that this was the third complaint regarding Abulsaad, and that three complaints for the current period of performance exceeded the quality level as established in the Service Delivery Summary allowed by Defendant's contract. Id.

RLM responded to the Air Force's April 15, 2010 complaint on April 26, 2010. Letter, Apr. 26, 2010, Ex. 18, DE-32-7, 11. RLM's letter said Abulsaad believed there were inconsistencies in the April 15, 2010 letter, and RLM requested a teleconference in order to determine a firm and final decision regarding Abulsaad's employment status. Id. During the conference call between RLM and the Air Force, the Air Force asked for Abulsaad to be removed from its contract because he was "not able to practice independently." Letter, May 5, 2010, Ex. 20, DE-32-7, 13. RLM subsequently notified Abulsaad of his termination by phone and in writing on May 5, 2010. Id. Abulsaad stated he was terminated because the customer, the Air Force, was "unhappy", but that it was also his belief that RLM had a problem with Egyptians and older people. Dep. K. Abulsaad, 104:19-25, 105:1-25.

Although Abulsaad and RLM were in contact throughout the time RLM and the Air Force Base were corresponding about Abulsaad's documentation deficiencies, Abulsaad never mentioned nor suggested to RLM that he was subjected to national origin or age discrimination at SJAFB. Id. at 92:3-17. Additionally, Abulsaad stated he was unaware of any personal animus by RLM or his supervisor (Mullen) against older people or Egyptians, and that he was the only Middle Eastern employee at the clinic and the oldest employee "by far." Id. at 102:19-23, 101:1-15. Abulsaad denied ever hearing any comment made by Mullen regarding Middle Easterners or

Arabs, but he described one incident, where the head of the health care technicians, a master sergeant, started dancing and singing a popular song from the 1980's, "Walk Like an Egyptian" as Abulsaad walked down the hall one day. Id. at 89:16-25. Abulsaad stated that other technicians and one or two staff members watched and laughed while the master sergeant sang and danced. Id. at 90:1-14. However, Abulsaad never complained or notified anyone about this occurrence nor did he have any indication that his supervisors were aware of it. Id. at 90:22-25, 91:1-4.

On June 4, 2010, Abulsaad filed a charge of employment discrimination and retaliation with the Equal Employment Opportunity Commission, charging discrimination on the basis of both national origin and age, and for retaliation. Compl., DE-1. He was issued a right-to-sue letter in September 2010. Id. Abulsaad filed a complaint against RLM in the United States District Court for the Eastern District of North Carolina, on November 17, 2011, under Title VII and the ADEA, alleging that he was terminated by RLM "because of" his national origin and age, and in retaliation for his complaints of harassment. Id. Defendant now seeks summary judgment on Plaintiff's claims. Further facts are set out as necessary to discuss the legal issues at hand.

## II.    **DISCUSSION**

### A.  **Standard of Review**

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To withstand a motion for summary

judgment, the non-moving party may not rest on the allegations, <u>Anderson</u>, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation omitted & emphasis removed); *see also* <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case." (internal quotation marks omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.

### B. <u>Employment Discrimination</u>

Plaintiff contends employment discrimination by two separate means. The ADEA forbids "an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's age." 29 U.S.C.A. § 623(a)(1) (emphasis added). Title VII similarly makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's . . . national origin." 42 U.S.C.A. § 2000e-2(a)(1) (emphasis added).

"Generally speaking, a plaintiff may avert summary judgment and establish a claim for intentional [national origin] or age discrimination through two avenues of proof." <u>Hill v. Lockheed Martin Logistics Mgmt.</u>, 354 F.3d 277, 284 (4th Cir. 2004). "First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision." <u>Id</u>. Additionally,

under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but for' cause of the challenged adverse employment action." Duffy v. Belk, Inc., 477 F. App'x 91, 93 (4th Cir. 2012) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 168 (2009)). "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Hill, 354 F.3d at 285*; see* Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973).

In order to demonstrate the *prima facie* case of either national origin or age discrimination under the pretext framework established by *McDonnell Douglas*, the plaintiff must present evidence that "'(1) [he] is a member of a protected class; (2) [he] suffered adverse employment action; (3) [he] was performing [his] duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Hill, 354 F.3d at 285; Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir.1999). If the Plaintiff satisfied this initial burden, then the employer may defend itself by articulating a "legitimate, nondiscriminatory reason" for the adverse employment action." Hill, 354 F.3d at 285. If the employer meets this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons "were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. "Once the parties satisfy their relatively modest obligations . . . 'the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against

[him]'" due to either his national origin or age.  Fuller v. Phipps, 67 F.3d 1137, 1141 (4th Cir.

1995) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

> "An employer would be entitled to a judgment as a matter of law if the record *conclusively* revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was *abundant and uncontroverted* independent evidence that no discrimination had occurred."

Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 649 (4th Cir. 2002) (citing Reeves v.

Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000)).

### 1. *ADEA Claim – Age Discrimination*

Abulsaad offers no direct evidence to support his claim for age based discrimination as

the "but for" cause of his termination, but instead, argues RLM's grounds for employment

termination were a pretext for discrimination.  Gross, 557 U.S. at 168.  Therefore, Abulsaad has

the initial burden to make a *prima facie* case of discrimination under the pretext framework in

order to defeat RLM's motion for summary judgment.  Hill, 354 F.3d at 285.  Under the

*McDonald Douglas* framework, there is no dispute Abulsaad is a member of a protected class, or

that he suffered an adverse employment action when he was terminated by RLM.  Id.  The

critical questions remaining are whether Abulsaad's evidence effectively demonstrated that he

met RLM's legitimate expectations, whether Abulsaad was replaced by an individual outside the

protected class or the position remained vacant, and whether Abulsaad established that

Defendant's proffered reasons for his termination were pretextual.  Id.

Abulsaad's *prima facie* case for age discrimination fails at the legitimate-expectation step

under the *McDonald Douglas* framework.  Id.  Abulsaad has not demonstrated, nor even argued,

that he was meeting RLM's legitimate expectations at the time of the adverse employment

action.  In one discrimination case, the plaintiff was unable to establish a *prima facie* case of age

discrimination because she failed to show that she was meeting her employer's legitimate expectations even though her initial performance evaluations were above satisfactory, and even more, her evaluations "never dipped below satisfactory-plus." Ruff v. Target Stores, Inc., 226 F. App'x 294, 301 (4th Cir. 2007).

What's more, RLM presented substantial evidence establishing that Abulsaad's job performance failed to meet RLM's legitimate expectations. Abulsaad's verbal complaint to Wishstilschin in February 2009 came after Mullen told Abulsaad that he had "serious concern" regarding Plaintiff's "fitness" for employment. Email, Dec. 28, 2009, Ex. 5, DE-32-6. Other incidents between Abulsaad's coworkers and patients resulted in three formal letters of concern from the Air Force and ultimately, Abulsaad's termination. The first complaint characterized Abulsaad's "attitude and challenging behavior" as unacceptable, and stated that he continued to "show an inability to improve" his documentation style after several efforts were made to retrain him. Letter, Feb. 3, 2010, Ex. 11, DE-32-6, 31. It was further documented that a military psychologist expended twenty-five hours to address Plaintiff's deficient documentation without improvement. Letter, Mar. 23, 2010, Ex. 14, DE-32-7, 5. A separate complaint further characterized Plaintiff's deficient medical documentation as "unclear/inconsistent", missing assessments for homicidal ideation, "not providing adequate information in the note to support diagnosis", and for "not documenting treatment provided." Letter, Apr. 15, 2010, Ex. 16, DE-32-7, 7. Abulsaad contests the accuracy and legitimacy of his supervisor's assessments. However, the issue is whether RLM, the decision maker, believed the complaints and critiques made by Abulsaad's Air Force supervisors as true; in this case, RLM did. *See* Wood v. Town of Warsaw, N.C., 914 F. Supp. 2d 735 (E.D.N.C. 2012); Holland v. Wash. Homes, Inc., 487 F.3d 208, 215–17 (4th Cir. 2007).

Abulsaad failed to present any evidence remotely supporting whether he was meeting his employer's legitimate expectations. Moreover, Plaintiff failed to address or make any attempt to satisfy the fourth element of a *prima facie* case of age discrimination, as to whether or not he was replaced by an individual outside the protected class, or whether the position remained vacant. Hill, 354 F.3d at 285. Abulsaad failed to meet his burden in establishing a *prima facie* case of discrimination on the basis of age.

In the alternative, had Abulsaad successfully met his burden, and established a *prima facie* case of discrimination, "Defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, based on the circumstances leading to Plaintiff's termination" and thus, defeated Abulsaad's claim in a second manner. Salter v. Alltel Commc'ns, Inc., 407 F. Supp. 2d 730, 736 (E.D.N.C. 2005).

RLM presented an abundance of evidence that demonstrated Abulsaad was counseled over performance related issues in February 2009, three months after he started at SJAFB, when Mullen verbally counseled Abulsaad for his negative interactions with a coworker and a patient. Email, Dec. 28, 2009, Ex. 5, DE-32-6. Moreover, evidence presented above depicted Abulsaad's employment history with RLM as one where he was counseled for patient care concerns, friction between coworkers, instances of tardiness, and deficient medical documentation. Abulsaad's Medical documentation deficiencies were twice identified by James during peer reviews in December 2009 and January 2010, and were further verified by Dr. Morrison during a review in January 2010. Id. The Air Force formally complained in writing regarding Plaintiff's deficient medical documentation on three separate occasions and characterized their assessment as "major findings for unacceptable performance." Letter, Apr. 15, 2010, Ex. 16, DE-32-7, 7, 8. Additionally, RLM asserts the "same actor inference defense" in his reply (DE-38), against

Abulsaad's claim for age discrimination. The Fourth Circuit previously stated, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991). Here, Plaintiff was both hired and fired by the same supervisor (Mullen) and the same decision maker (RLM) in a period of time not exceeding eighteen months. Therefore, even if Abulsaad had presented a *prima facie* case of discrimination, RLM met the burden of demonstrating a "legitimate, nondiscriminatory reason for the adverse employment action, based on the circumstances leading to Plaintiff's termination." Salter, 407 F. Supp. 2d at 736.

Pursuing this hypothetical analysis in the alternative a step further, "[b]ecause [Defendant] put forth legitimate, non-discriminatory reasons for its decision, [Plaintiff] bears the final burden of showing that the reasons presented by [Defendant] are merely pretexts for age discrimination." Duffy, 477 F. App'x at 95-96. Pretext could be established by Plaintiff, if Defendant's reasons given were "unworthy of credence" or if Plaintiff presented other evidence "sufficiently probative of age discrimination." Id. at 96 (quoting Mereish v. Walker, 359 F.3d 330, 335 (4th Cir. 2004)). Abulsaad asserted in his complaint that the Air Force's characterization of his "inability to practice independently was untrue and dishonest" and a pretext for discrimination "because there was not one job performance cause to justify it." Compl., DE-1, p.7. Abulsaad offered several arguments as to why RLM's reasons for termination were pretextual, including (1) a junior technician was assigned to process Abulsaad when he first arrived at the clinic, causing confusion and delay which resulted in Abulsaad yelling at the technician and thus creating animosity between him and the other employees; (2)

Abulsaad's complaints to the hospital chain of command about Mullen's harassment; (3) James discriminatory attitude during peer reviews on Abulsaad's documentation; and (4) Abulsaad's work load as compared to his supervisors.  Compl., DE-1.  Although Abulsaad claimed the underlining behaviors of his supervisors and the endorsement by RLM were discriminatory, it is unlikely that a jury would conclude Plaintiff's termination was for any other reason than his unsatisfactory performance.

Abulsaad's claim for age discrimination is defective at multiple levels.  As detailed above, he failed to offer any credible evidence from which one could conclude RLM's action was a pretext for discrimination.  What's more, RLM presented a "legitimate, nondiscriminatory reason for the adverse employment action, based on the circumstances leading to Plaintiff's termination" and defeated Plaintiff's claim in the alternative.  Salter, 407 F. Supp. 2d at 736. Defendant is entitled to summary judgment on Plaintiff's ADEA claim.

### 2. Title VII Claim – National Origin Discrimination

Abulsaad also fails to establish a *prima facie* case of discrimination on the basis of national origin under Title VII.  Abulsaad relies on the same evidence presented for his ADEA claim, and for the same reasons detailed above, fails to present evidence that his job performance was in line with his employer's legitimate expectations.  Additionally, Abulsaad proffers no evidence and completely avoids the issue of his replacement or conversely, the possibility that the position remained vacant.  In an effort to examine Plaintiff's complaint from all possible perspectives, the court considers another variance of the *McDonald Douglas* framework.  "The elements of a *prima facie* case, of course, may change depending on a case's [']differing factual situations.[']"  E.E.O.C. v. PBM Graphics Inc., 877 F. Supp. 2d 334, 344 (M.D.N.C. 2012), *See* E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir. 2001) (quoting McDonnell

18

<u>Douglas</u>, 411 U.S. at 802 n. 13, 93 S.Ct. 1817). "The Fourth Circuit has explained that [']a]bsent direct evidence, the elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.[']" <u>PBM Graphics</u>, 877 F. Supp. at 344; <u>Coleman v. Md. Court of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010) (citing <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004)), *aff'd* —— U.S. ——, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012).

Abulsaad presents no direct *evidence* of discrimination against his national origin. Under this model of construction, there is no dispute that he was a member of a protected class who experienced adverse employment action, satisfying the first and third elements. <u>Id</u>. However, the requirement for satisfactory job performance is not met for all the same reasons examined above; succinctly summarized by Abulsaad's employer (RLM) in his termination notice on the grounds of "major findings for unacceptable performance." Letter, Apr. 15, 2010, Ex. 16, DE-32-7. Abulsaad fails to produce any evidence to suggest his employment performance was other than unsatisfactory. Additionally, he does not offer any evidence of different treatment from similarly situated employees outside his protected class. <u>PBM Graphics</u>, 877 F. Supp. at 344. Therefore, Abulsaad's *prima facie* claim for discrimination on the basis of national origin is multiply deficient.

Similar to the analysis conducted above in the alternative for the ADEA claim, even if Abulsaad had successfully met his burden and established a *prima facie* case of discrimination; his discrimination claim would still ultimately fail. "Defendant articulated a legitimate, nondiscriminatory reason for the adverse employment action based on the circumstances leading to Plaintiff's termination" and defeated Plaintiff's claim in the alternative. <u>Salter</u>, 407 F. Supp.

2d at 736. Abulsaad's final burden was to prove that RLM's reasons for termination were mere pretexts for national origin discrimination. Duffy, 477 F. App'x at 95-96. However, Abulsaad proffers no additional evidence as to why RLM's reasons might fall short in establishing a legitimate, nondiscriminatory reason for the adverse employment action. Salter, 407 F. Supp. 2d at 736. Abulsaad relies on the identical arguments made above in his claim for age discrimination, with the additional consideration that "[t]he prejudice against Middle East nationals has prevailed, understandably, since 9/11/2000 [sic]." Compl., DE-1, p.12. Abulsaad added, "[i]t never occurred to RLM to exercise more caution or scrutiny to my termination for that reason alone" and further, "[i]n their eagerness to please their customer they were discriminatory." Id. Abulsaad's claim fails because "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for a discharge." Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999) (internal quotation omitted). As with the ADEA claim, Plaintiff fails to offer evidence from which one could conclude that RLM's action was a pretext for discrimination against his national origin. More, RLM presents a "legitimate, nondiscriminatory reason for the adverse employment action, based on the circumstances leading to Plaintiff's termination" and thus defeats Abulsaad's claim, even if he had brought forth a legitimate claim of discrimination. Salter, 407 F. Supp. 2d at 736. Defendant is entitled to summary judgment on Plaintiff's Title VII claim.

## C. **Retaliation**

Abulsaad asserts a claim for retaliation against him for filing a complaint for harassment against his supervisor (Mullen) with the hospital chain of command. "A plaintiff can prove illegal retaliation under Title VII by showing (1) he engaged in protected activity, (2) he suffered

an adverse employment action at the hands of his employer; and (3) the employer took the adverse action because of the protected activity." Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001). Once the plaintiff makes this case, the employer can defend itself by producing evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. Id. "It is then up to the jury to decide whether the adverse action was actually taken for the proffered reason, or if it was intended as a retaliatory measure." Id.

Abulsaad engaged in a protected activity when he filed a complaint for harassment against his supervisor to the Hospital Deputy Commander at SJAFB. "A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission . . . to engage in a protected activity . . . [c]omplaints to supervisory or management employees concerning harassment . . . are included within the definition of protected activity." Bickford v. Denmark Technical Coll., 479 F. Supp. 2d 551, 568 (D.S.C. 2007). Additionally, it is not disputed that Abulsaad suffered an adverse employment action.

However, Abulsaad presents no evidence that either RLM or his supervisor (Mullen) took any action against him because of the complaint. Rather, the evidence above (discussed in both the ADEA and Title VII claims for discrimination) plainly show Abulsaad was counseled for unacceptable professional conduct and performance related shortcomings with respect to his inability to effect medical documentation in accordance with acceptable standards required by the Air Force. Email, Feb. 1, 2010, Ex. 10, DE-32-6, 30. Further, evidence shows that Abulsaad received reasonable retraining opportunities by his supervisors designed to address his documentation shortcomings, despite the complaints he lodged against them, but that he failed to correct his deficient documentation practice and was ultimately terminated for continued

unsatisfactory performance. Abulsaad's attempts to draw any connection between the filing of his harassment complaint and the alleged "retaliation" by RLM are merely speculative and are not supported. Abulsaad has presented insufficient evidence of retaliation by RLM to survive summary judgment.

## III.    <u>CONCLUSION</u>

Abulsaad has failed to forecast sufficient evidence to support his allegations against RLM. Because no genuine dispute of material fact exists regarding Defendant's decision to terminate Plaintiff, the undersigned recommends the Defendant's motion for summary judgment (DE-32) as to Plaintiff's claims for discrimination and retaliation be GRANTED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, August 8, 2013.

_____\
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE